**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

LINDA TATOM,

      Plaintiff - Appellant,

v.

RES-CARE, INC., d/b/a Guthrie Job Corp
Center,

      Defendant - Appellee.

No. 14-6125
(D.C. No. 5:13-CV-00037-W)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY, BALDOCK,** and **PHILLIPS,** Circuit Judges.
_____

Plaintiff Linda Tatom, while a teacher at Guthrie Job Corps Center ("GJCC"),

refused to return to work after an altercation with a GJCC trainee. Defendant Res-Care,

which operates GJCC, deemed Tatom's prolonged absence a voluntary resignation and

terminated her. Tatom sued, claiming age discrimination in violation of federal law and

wrongful discharge in violation of Oklahoma law. The district court granted summary

judgment to Res-Care. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

GJCC is a federal program administered by the United States Department of Labor ("DOL") that provides no-cost vocational and academic training to people ages 16 to 24. GJCC is federally funded and governed by DOL Guidelines. It does not receive any funding from the state of Oklahoma or the Oklahoma Department of Education ("ODE"). GJCC's primary focus is providing technical training; however, it also offers trainees the opportunity to earn a GED or high school diploma. In order to offer high school diplomas, GJCC must submit annually to ODE a form titled "Application for Accreditation: Charter School."

Res-Care is a private for-profit company that operates GJCC pursuant to a contract with the DOL. In 2006, Res-Care hired Tatom, then age 56, as an at-will employee at GJCC. Tatom taught various courses at GJCC until October 28, 2011, when she was involved in an altercation with C.F., a male GJCC trainee. The facts underlying this altercation are in dispute, but not material. According to Tatom, C.F. "bolted at" her "and got nose to nose with" her. Tatom then used her clipboard to protect her face, but C.F. hit the clipboard which in turn hit Tatom's face. C.F. then told Tatom "on blood, I am going to kill you." Tatom filled out an incident report and a separate type-written statement concerning this altercation the same day, but Tatom did not fill out the section of the incident report that asked her to identify whether C.F.'s actions amounted to a Level I infraction, requiring immediate separation from GJCC, or a lesser Level II infraction. Then, after declining an offer for a ride home, Tatom was permitted to leave for the day.

On various occasions between October 30 and November 4, 2011, Tatom spoke by phone to Donna Betchan, GJCC's academic manager, and Amber Bedick, GJCC's human resources manager. Betchan and Bedick told Tatom during these calls that she needed to return to work. Tatom never requested a leave of absence; rather, she informed Betchan and Bedick that she would not return to GJCC as long as C.F. was on the premises.

On Friday, November 4, 2011, Bedick sent Tatom a letter informing her that she was "in violation of [GJCC]'s policy #7.1–12 of job abandonment." The letter also informed Tatom that she "ha[d] until Wednesday, November 9, 2011 at 8:00 a.m. to report to the Human Resources office," and that if she did not report, Res-Care would classify her actions as "job abandonment" and report them as a "voluntary resignation."

On Monday November 7, Tatom sent an email to GJCC Director Priscilla Mayberry and copied Bedick, among others. Tatom's email first asserted that GJCC was "not in compliance with" the Oklahoma School Protection Act ("OSPA"), particularly that section of the OSPA "concerning student violence." Tatom also acknowledged in this email that Friday, November 4, was her "third unexcused day not to report to school," and that Bedick had told her on November 4 that she needed "to come to HR on Monday, November 7 to sign papers for 'disciplinary action up to termination.'" Tatom concluded this email by asking for her appointment time to see HR, but also restated that she would not come to GJCC "at all" if C.F. was still on the premises.

Tatom, then age 61, did not report to GJCC's Human Resources office on Wednesday, November 9. In response, Bedick, Betchan, and Mayberry terminated Tatom and listed violations of company Policies 7.1(A)(11)–(12) as the "Reason for the

Action."[1]  Res-Care initially used substitute teachers to fill the void left by Tatom but eventually assigned two preexisting teachers—Doug Ford, then age 56, and Jill Zimmer, then age 53—to take over Tatom's teaching duties.  GJCC disciplinarily discharged C.F. on November 14, 2011.

Tatom sued Res-Care on January 9, 2013 claiming (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), and (2) retaliatory wrongful discharge in violation of Oklahoma public policy.  The district court granted summary judgment to Res-Care on both claims.  Tatom then filed a motion to alter or amend the judgment under Rule 59(e), which the district court denied.

## II.

"We review the district court's order granting summary judgment de novo." Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 627 (10th Cir. 2012).  We do not judge witness credibility or weigh evidence.  Rather, we view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in her favor.  A grant of summary judgment is proper only if there is no genuine dispute as to any material fact, and the evidence is such that no reasonable jury could find in favor of the non-moving party.  Id.

---

[1] Policy 7.1 generally lists "actions which will be . . . subject to corrective action up to and including termination of employment."  Policy 7.1(A)(11) lists "unauthorized absence from the work area" as one such action.  Policy 7.1(A)(12) lists "[u]nreported absence of two (2) consecutive scheduled work days without directly notifying the supervisor on duty," as another such action and provides that "[t]his form of separation will be considered as job abandonment (extenuating circumstances may be considered) and reported as a voluntary resignation."

III.

Tatom admits both of her claims on appeal depend on GJCC being a "school" subject to the OSPA. As such, we address this issue first. Tatom argues GJCC is subject to the OSPA because it is a charter school. The district court, however, held that as a matter of law GJCC was not a charter school. We agree.

The OSPA defines a "school" as either (1) "a public school district," (2) a "governmental entity that employs teachers," or (3) a "private kindergarten, elementary, or secondary school." Okla. Stat. Ann. tit. 70, § 6-149.3(2). Tatom conclusorily asserts in her brief that, based on the "plain language of the [O]SPA, GJCC is a school." Yet she nowhere attempts to establish which of these three categories GJCC should fall into, let alone why. "Conclusory legal statements cannot preclude summary judgment." Nahno-Lopez v. Houser, 625 F.3d 1279, 1285 (10th Cir. 2010).[2]

Indeed, rather than analyze the nature of GJCC under the language of § 6-149.3(2), Tatom relies on two facts not discussed in that subsection to assert that GJCC is

---

[2] Even were we to entertain this conclusory legal statement, the record lacks sufficient evidence to determine how GJCC would qualify as a school under the OSPA. First, GJCC is clearly not a public school district. Moreover, Tatom makes no effort to establish that GJCC is a governmental *entity*. Rather, GJCC is part of federal *program* operated by Res-Care, a private for-profit entity. See 29 U.S.C. § 2887(a)(1)(A) ("The Secretary shall enter into an agreement with a Federal, State, or local agency, an area vocational education school or residential vocational school, *or a private organization*, for the operation of each Job Corps center." (emphasis added)). Finally, Tatom provides no evidence that GJCC is a "private . . . secondary school" under Oklahoma law. A private school is a "privately owned . . . entity," Okla. Stat. Ann. tit. 70, § 21-101, and we see nothing in the record to establish that GJCC is itself privately owned, by Res-Care or anyone else. All the record establishes is that GJCC is part of a federal program, overseen and administered by the DOL, and operated by a private for-profit organization. This is not enough to establish that GJCC is a school as defined in the OSPA.

a school under the OSPA: first, that GJCC annually files a form with the ODE entitled "Application for Accreditation: Charter School," and second, that GJCC confers GEDs and high school diplomas. On these facts alone, Tatom concludes that GJCC must be an Oklahoma charter school and therefore must be subject to the OSPA. We disagree.

Oklahoma charter schools are governed by the Oklahoma Charter Schools Act ("OCSA"). Okla. Stat. Ann. tit. 70, §§ 3-130 to 3-143. Under this act, charter schools must "comply with all federal regulations and state and local rules and statutes relating to health, safety, civil rights and insurance." Id. at § 3-136(A)(1). Moreover, charter schools are "to the extent possible . . . subject to the same reporting requirements . . . as a school district." Id. at § 3-136(A)(6). Significantly, however, the OCSA applies "only to charter schools formed and operated under the provisions of [the OCSA]." Id. at § 3-132(A). Moreover, the OCSA defines "charter school" as

> a public school established by contract with [1] a board of education of a school district, [2] an area vocational-technical school district, [3] a higher education institution, [4] a federally recognized Indian tribe, or [5] the State Board of Education pursuant to [OCSA] to provide learning that will improve student achievement and as defined in the Elementary and Secondary Education Act of 1965, 20 U.S.C. 8065.

Id. at § 3-132(B).

Tatom appears to argue that, by annually filling out and submitting to ODE the "Application for Accreditation: Charter School" form, GJCC became "a public school established by contract with . . . the State Board of Education." Not so. GJCC was not established by contract with the Oklahoma State Board of Education. Rather, GJCC is part of a federal program, established by federal law, administered by the DOL, and

operated by a private company through a contract with the DOL.  GJCC annually fills out this accreditation application for the sole purpose of offering high school diplomas to its trainees in accordance with published *federal* guidelines and policies.  Finally, lest any doubt remain, Oklahoma itself does not identify or recognize GJCC, or any other Job Corps for that matter, as a charter school subject to ODE requirements.  See Current Charter Schools of Oklahoma, Oklahoma State Department of Education, http://www.ok.gov/sde/current-charter (last visited Feb. 17, 2015).

In sum, Tatom has failed to provide sufficient evidence, even drawing all inferences in her favor, to establish that GJCC is a school subject to the OSPA, either under the language of the OSPA itself, or as a charter school.

IV.

Given that GJCC is not a school subject to the OSPA or OCSA, Tatom's ADEA and retaliatory wrongful discharge claims fall flat.  We address each in turn.

A.

Under the ADEA, an employer may not "discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Tatom acknowledges her age discrimination claim is based entirely on circumstantial evidence, thus, the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1972), applies.  Under this framework, Tatom must first establish a prima facie case of discrimination by showing (1) membership in a protected class and (2) an adverse employment action that (3) took place under circumstances giving rise to an inference of discrimination.  EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).  If Tatom

can establish a prima facie case, the burden shifts to GJCC to assert a legitimate nondiscriminatory reason for its actions. If it can do so, the burden shifts back to Tatom to introduce evidence that the stated nondiscriminatory reason is merely a pretext for discriminatory intent. Daniels, 701 F.3d at 627.

The district court found Tatom had established a prima facie case of age discrimination because Tatom was in a protected age group, was qualified to perform her duties and was doing so satisfactorily until the C.F. altercation, was fired by Res-Care, and was replaced by younger employees. We assume without deciding that Tatom has established a prima facie case of age discrimination. See Aramburu v. Boeing Co., 112 F.3d 1398, 1403 (10th Cir. 1997).

Turning to the second step of the McDonnell Douglas framework, the district court found Res-Care had established a legitimate nondiscriminatory reason for its action. We agree. The record amply supports Res-Care's proffered nondiscriminatory reason for discharging Tatom. Tatom missed eight consecutive workdays following her altercation with C.F. and admitted in her November 7 email that at least three of these absences were unexcused. Furthermore, Tatom failed to report to Human Resources on November 9, 2011, even though she had been notified in writing that failure to do so would be treated as a voluntary resignation.

This brings us to the third step of the McDonnell Douglas framework, under which the burden shifts back to Tatom, who must show that Res-Care's stated reasons were a pretext for its discriminatory intentions. The district court found Tatom had failed to introduce evidence that Res-Care's nondiscriminatory reason was merely pre-textual.

Again, we agree. In order to demonstrate pretext, Tatom must produce "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Res-Care's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [Res-Care] did not act for the asserted non-discriminatory reasons." Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005). Tatum asserts Res-Care's proffered explanation for her termination is unworthy of credence because (1) Res-Care violated its own Policy and Practice Manual in terminating her, (2) GJCC underplayed the severity of C.F.'s infractions, (3) Res-Care failed to handle C.F.'s infractions in a timely fashion, and (4) Res-Care and GJCC employees and former employees lied in an attempt to cover up the real reason for her termination. None of these assertions hold water.

"It is well-established that pretext can be shown by evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1119 (10th Cir. 2007). Tatom believes Res-Care acted contrary to written company policies that authorized and excused her concededly "excessive absenteeism," but her two-pronged argument on this point misapprehends both the applicable law and the applicable company policies. First, Tatom points out that Res-Care's Policy 7.2(B) states "[a]uthorized absences are defined by . . . applicable state/provincial laws," among other things. But this argument misapprehends the law. Tatom relies solely on the OSPA, specifically Okla. Stat. Ann. tit. 70, § 6-149.8, to "authorize" her absences; however, as we explained above, the OSPA does not apply to GJCC. Thus, Policy 7.2(B) gets Tatom

nowhere.  Second, Tatom argues Res-Care's written policy mandates Res-Care "shall" consider extenuating circumstances but Res-Care did not consider the circumstances related to her altercation with C.F. before terminating her.  This argument misapprehends Res-Care's policies.  The policies Tatom was charged with violating do not require Res-Care to consider extenuating circumstances.  Policy 7.1(A)(11) says nothing about extenuating circumstances, and Policy 7.1(A)(12) says only that "extenuating circumstances *may* be considered." (emphasis added).  On the other hand, the policies Tatom relies on to mandate consideration of extenuating circumstances do not apply directly to her case.  For example, Policy 7.2(C) relates not to the justification for an absence, but to an employee's failure to timely report that absence.  Moreover, although Policy 7.2(I) states that Res-Care will consider the reasons employees give to justify their absences, it then refers back to Policy 7.2(B) which lists the reasons that may justify an absence.  Tatom's proffered reason (fear based on an altercation with a trainee) does not appear on that list.  Tatom also argues that Res-Care violated Policy 7.2(K) because that policy defines "job abandonment" as "when an employee is absent for two (2) consecutive scheduled work days without prior notice . . ." and Tatom gave notice to both Betchan and Bedick that she would not return to GJCC as long as C.F. was on center. What Tatom fails to acknowledge, however, is that Policy 7.2(K) applies to absences "without prior notice to *or approval from* his/her immediate supervisor," (emphasis added), and Tatom admits she never requested a leave of absence, let alone received approval for her absences.

Tatom goes on to assert that other actions surrounding the C.F. altercation prove Res-Care did not act in good faith in terminating her. We disagree. Tatom asserts that GJCC should have classified C.F.'s actions against her as a Level I infraction, which requires automatic separation, but instead "falsified" its incident report by labeling C.F.'s actions as a less severe Level II infraction. But Tatom's own incident report fails to specify whether C.F.'s infraction was a Level I or a Level II infraction, even though the report form clearly provides boxes to indicate the alleged infraction level. Given that even Tatom did not initially identify C.F.'s infraction level, we cannot fault Res-Care or GJCC for not applying the classification Tatom later decided should have applied.

Tatom also asserts GJCC failed to immediately submit the C.F. reports to the Behavior Modification Officer ("BMO") as required by its zero tolerance policy for student violence. Rather, she believes her November 7 email is the only reason C.F.'s actions were reported. Even assuming GJCC did not submit the C.F. altercation to the BMO until after Tatom sent her November 7 email, however, the zero tolerance policy Tatom relies on states that it is for the benefit of GJCC trainees, not GJCC staff like Tatom. As such, any shortcomings in Res-Care's implementation of this zero tolerance policy are not so intertwined with the reasons for Tatom's termination as to raise a genuine question of pretext. Tatom contends that, had Res-Care immediately followed its zero tolerance policy, C.F. might have been discharged by November 9, and thus Tatom would have felt safe returning to GJCC before the deadline listed in Bedick's letter. But the record belies this contention. Bedick's November 4 letter to Tatom informed her that she needed to return only to GJCC's Human Resources office by November 9 to avoid

voluntary resignation. Even if C.F. was still on center at the time, we see no reason why he would be at the Human Resources office. Furthermore, Tatom acknowledges that if she truly did fear coming to GJCC because of C.F., she could have asked one of the employees at GJCC's security gate to escort her to Human Resources, but she did not.[3]

In any event, "the pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual." Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) (alterations and quotation marks omitted). Indeed, "the issue is not whether the decision to terminate [Tatom] was wise, fair or correct, but whether [Res-Care] reasonably believed at the time of the termination that [Tatom] had violated company policy, and acted in good faith upon that belief." Timmerman, 483 F.3d at 1120.

In sum, Res-Care may not have applied its policies as prudently as possible to Tatom's case, but that is not the question before us. Tatom missed eight consecutive workdays (at least three of which were concededly unexcused absences) without ever requesting a leave of absence. Moreover, she failed to report to GJCC's Human Resources office by November 9 even though Bedick had notified her in writing that such failure would be treated as a voluntary resignation. These actions gave Res-Care reason to genuinely believe Tatom had violated its company policy and to terminate her in good faith under that policy. Although Tatom may have provided grounds on which to

---

[3] Finally, to the extent Tatom now argues that current and former Res-Care employees lied to cover up the real reason for her termination, Res-Care points out that this issue was not raised below, and Tatom does not point to any place in the record that shows she made such an argument below. As such, this argument is waived. Wilburn v. Mid-S. Health Dev., Inc., 343 F.3d 1274, 1280 (10th Cir. 2003).

question the prudence with which Res-Care handled the situation stemming from her altercation with C.F., she "has not created a genuine issue concerning the sincerity of the proffered reasons for her termination." Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1994). As such, Tatom has failed to introduce sufficient evidence to indicate pretext, and the district court properly granted summary judgment to Res-Care on her ADEA claim.

B.

Tatom also asserts that Res-Care wrongfully terminated her in retaliation for her November 7 email, which reported what she believed were violations of the OSPA. The district court concluded that, "even assuming [Oklahoma law] does not preclude Tatom's whistleblower/retaliation claim," Tatom was not entitled to relief because, among other things, GJCC was not a "school" subject to the OSPA. Thus, Tatom's allegations of OSPA violations could not serve as the basis for a whistleblower claim. We agree. As we explained above, GJCC is not a charter school or otherwise subject to the OSPA. Moreover, Tatom has not identified any other applicable law that Res-Care may have been violating. Accordingly, as there was nothing for Tatom to blow the whistle on, her

wrongful termination whistleblower/retaliation claim fails.[4]

        AFFIRMED.

                                      Entered for the Court,


                                      Bobby R. Baldock
                                      United States Circuit Judge

---

[4] Because we agree that Tatom's wrongful termination claim fails because GJCC is not subject to the OSPA, we do not address the district court's alternative holdings on the issue.